UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Mark L. Dove, | Civil Action No.: 15-CV-224-JL |
| and | |
| Kathleen M. Stavaski, | **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| The Bank of New York Mellon, as Successor Trustee f/b/o holders of Structured Asset Mortgage Investments II Inc, Bear Stearns ALT-A Trust 2006-2, Mortgage Pass-Through Certificates, Series 2006-2, | **PLAINTIFFS' FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND FOR DAMAGES** |
| and | |
| Select Portfolio Servicing, Inc., | |
| Defendants. | |

COME NOW the Plaintiffs, Mark L. Dove and Kathleen M. Stavaski, by and through the undersigned Counsel, and for their First Amended Complaint for Damages and Injunctive Relief, state as follows:

JURISDICTION, CAUSE OF ACTION, AND VENUE

1. Defendant removed this action to this Court pursuant to 28 U.S.C. § 1441 (b), invoking this Court's Diversity Jurisdiction pursuant to 28 U.S.C. § 1332 (a).

2. Plaintiffs bring their causes of action pursuant to RSA § 479:25, II and New Hampshire's common law.

3. Venue is appropriate in this Court because the real estate that is the subject matter of this action is located in New Hampshire, and the Plaintiffs reside in New Hampshire.

PARTIES

4. Plaintiff Mark L. Dove ("Mark") is an individual residing at 577 Canaan St., Grafton

County, Canaan, New Hampshire.

5. Plaintiff Kathleen M. Stavaski ("Kathleen") is an individual residing at 577 Canaan St., Grafton County, Canaan, New Hampshire.

6. Mark and Kathleen are husband and wife. When referred to collectively, they will be referred to as the "Plaintiffs" or "Mark and Kathleen."

7. Defendant The Bank of New York Mellon ("BONYM") is a federally chartered bank with its principal place of business at 1 Wall Street, New York, New York.

8. Defendant Select Portfolio Servicing, Inc. ("SPS") is a corporation in the business of mortgage loan servicing, and has its principal place of business at 3815 S. West Temple, Salt Lake City, UT 84115, and has a registered agent in New Hampshire at Lawyers Incorporating Service DBA Lawyers Inc Service at 14 Centre Street, Concord, NH 03301.

## FACTS

*Origination, Note & Mortgage Details, and Assignments*

9. On or about November 30, 2005, the Plaintiffs purchased their residence at 577 Canaan St., Canaan, New Hampshire (the "Property") at a price of $936,000.00.

10. The Plaintiffs financed the home with two (2) mortgages to CTX Mortgage ("CTX") as lender, with Mortgage Electronic Registration Systems, Inc. ("MERS") as the lender's nominee: the first mortgage was in the original principal amount of $748,800.00, recorded on November 30, 2005 at the Grafton County Registry of Deeds at Book 3224 Page 933 (the "Mortgage").

11. The Mortgage secured a promissory note (the "Note").

12. On October 12, 2009, MERS assigned the Plaintiffs' First Mortgage to BONYM,

without recourse. The Assignment was recorded on October 30, 2009, in the Grafton County Registry of Deeds at Book 3657, Page 2.

13. It is unknown if the Note was similarly transferred at the same time, but there is no evidence that it was. In response to a February 2015 letter, Defendants acknowledged that one of them possessed the original "blue-ink" Note, but the Plaintiffs have yet to see it.

14. Paragraph 12 of the Mortgage gives the mortgagee the discretion to provide loss mitigation opportunities in lieu of foreclosure.

15. Paragraph 11 of the Note states specifically that the mortgage is meant to protect the note-holder, not the mortgagor.

16. The Note is undated and indorsed in blank.

*Loss Mitigation Attempts with Chase and Initial Foreclosure Notice and Plaintiffs' Response*

17. In 2009, Mark became unemployed, and the Plaintiffs had to expend extra funds to care for Kathleen's elderly parents. Therefore, the Plaintiffs fell behind on their mortgage payments.

18. Shortly after falling behind on their payments, Plaintiffs began diligently pursuing loss mitigation options with JP Morgan Chase, N.A. (hereinafter "Chase"), who claimed to be the holder of the Note and Mortgage.

19. Ultimately, in the fall of 2011, Chase agreed to a short-sale in the net amount of $374,472.50. Chase also claimed to be the holder of the Note.

20. In a letter dated September 26, 2011, Chase, through EMC Mortgage Corporation, also claimed to be the holder of the Plaintiffs' Second Mortgage and Note and agreed to accept $1,000.00 to release the Second Mortgage lien as part of the short sale.

21. The Plaintiffs moved forward with the short-sale. However, at the closing, Chase was unable to prove that it held the Note, and the sale could not be completed.

22. In July of 2012, Plaintiffs made a regular monthly payment to Chase, but Chase refused to accept it even though the loan had not been accelerated.

23. On January 10, 2013, Chase sent a letter entitled "Acceleration Warning" to the Plaintiffs.

24. On February 22, 2013, Harmon Law Offices, on Chase's behalf sent an acceleration letter to the Plaintiffs with respect to the First Mortgage.

25. On March 5, 2013, BONYM, through its attorneys, sent a Notice of Mortgage Foreclosure Sale to the Plaintiffs.

26. On March 8, 2013, Plaintiffs' counsel notified Harmon Law Offices that the Plaintiffs demanded verification of the debt, an opportunity to view the original Note, and an accounting.

*Transfer to BONYM, New Foreclosure, Final Loss Mitigation Attempts*

27. On May 10, 2013, Harmon Law Offices sent a letter to Plaintiffs' attorney, with alleged verification of the debt. In that letter, Chase's attorneys claimed that Chase had authority to perform a loan modification or other loss mitigation workout. In the late summer of 2013, Harmon Law Offices did produce the original Note for inspection.

28. However, Chase never foreclosed.

29. By notice dated September 18, 2013, BONYM scheduled a foreclosure sale for October 17, 2013 at 5:00 p.m.

30. Select Portfolio Servicing ("SPS"), Chase's alleged servicer, told the Plaintiffs that there were foreclosure alternatives available to them. Plaintiffs completed a loan

modification application in reliance on that representation; however, SPS refused to consider any such alternatives. In fact, SPS continued to demand that the Plaintiffs resubmit the same paperwork they had already submitted well into 2014, finally refusing to engage with them any further after SPS would not provide Plaintiffs with alternative means to prove their financial position when they could not provide tax returns as far back as SPS wanted.

31. In addition, the Plaintiffs had a cash buyer who was ready, willing, and able to purchase the property at a short-sale. However, SPS took a substantial amount of time to follow through to complete the short-sale, including by delaying obtaining "Buyer's Purchase Opinion" ("BPO").

32. In November 2013, the Plaintiffs and BONYM, through SPS, started the short-sale process again. Upon BONYM's request, by and through SPS, Plaintiffs provided all the documentation that BONYM required, and waited patiently for SPS to conduct a BPO to determine the Property's value. It was not until the beginning of January 2014 that BONYM finally hired an agent to conduct the BPO.

33. Despite the Plaintiffs having provided the required documentation, BONYM, nevertheless demanded additional documentation.

34. BONYM, by and through SPS, continued to stall the short-sale process, and it appears to have had no intention to follow through, despite its representations to the contrary.

35. As of January 1, 2014, SPS claimed to be the servicer for BONYM, not Chase. SPS describes BONYM as the Trustee to the "Structured Asset Mortgage Investments II Inc., Bear Stearns ALT-A Trust 2006-2, Mortgage Pass-Through Certificates, Series 2006-2" Trust (the "Trust").

36. The same delays occurred with Plaintiffs' attempts to modify the loan. Despite submitting complete loan modification packages to SPS, SPS demanded additional documentation, and sometimes, duplicative documentation. Ultimately, BONYM scheduled a foreclosure for July 24, 2014 at 11:00 a.m. However, it cancelled that sale.

37. Throughout the Plaintiffs' history of working with Defendants and their predecessors, the Plaintiffs have continued to be subjected to delay tactics that have caused the arrears, fees, and interest to accrue over time and ultimately leading to a situation that leaves the Plaintiffs in a position of losing their home to foreclosure, and leaving them with a substantial deficiency.

### *Lack of Unity of Note and Mortgage*

38. The First Mortgage identifies MERS as CTX' "Nominee," but the First Mortgage fails to define the role or purpose of the "Nominee." The First Mortgage also identifies MERS as the "Mortgagee." The Note does not mention MERS and it does not use the word "nominee."

39. In fact, based on the language in the First Mortgage, it appears that the only "authority" CTX intended to give MERS was with respect to the Mortgage but not the Note. In other words, MERS and the lender intentionally split the obligation and the mortgage deed. As a result, from the inception of the loan, the First Mortgage and related Note were bifurcated.

40. MERS, never holds title or interest in a promissory note. Therefore, MERS never has any authority to sell, grant, assign or otherwise transfer a promissory note from one entity to another.

41. Despite this, MERS created a document for the purposes of assigning the First Mortgage and Note to BONYM and on October 30, 2009, filed the same with the Grafton County Registry of Deeds.

42. Therefore, despite the appearance of transferring both the Mortgage and the Note, it actually only transferred the Mortgage.

*Failure to Properly Assign Mortgage and Note to Trust*

43. Furthermore, neither the Note nor the Mortgage were properly assigned, sold, or otherwise transferred into the Trust.

44. The Internal Revenue Code ("IRC") ("26 U.S.C §860 A-G") governs the creation and functioning of Real Estate Mortgage Investment Conduits ("REMIC"s). Both IRC and the Trust documents state specific performance time frames and deadlines by which originals and/or copies of promissory notes, mortgages, intermediary Assignments of Mortgage, title insurance policies, etc. must be included into the "Mortgage Loan File" for proper securitization into the Trust. The Trust Pooling and Servicing Agreement ("PSA") and Prospectus (collectively, the "Trust documents") mirror the IRC requirements.

45. These time frames and deadlines are oftentimes expressed as periods of time allowed to elapse from the date on which the Trust was "officially" created. Such date is generally characterized in Trust documents as the "Closing Date" which is also recognized as the "Startup Date" for a Trust.

46. In the case of the First Mortgage Note, the Trust documents define the "Closing date" of the Trust as "on or about March 31, 2006."

47. According to the Trust documents and/or IRC, if the Note was intended to be included as an original asset of the Trust, the original Note, Mortgage, any intermediary Assignments of Mortgage in existence, title policies, etc. had to be included in the "Mortgage Loan File" no later than 90 days after the March 31, 2006 Closing Date for the Trust.

48. As evidenced by the language within the four corners of the Assignment of Mortgage, MERS did not come close to meeting this deadline. It did not assign the Mortgage to the Trust until October 30, 2009, more than three years after the Closing Date.

49. Provisions are made within the majority of REMIC Trust documents and certainly within IRC for "Substitute Mortgage Loans" to be swapped into a trust in order to replace non-performing loans with loans with like-kind parameters. Generally speaking, such substitutions are only allowed to be made within two years of the Closing Date of a Trust.

50. Per the terms of this Trust's documents and IRC, if the Note was characterized as a "qualified substitute mortgage" such substitution into the Trust would have had to be made no later than approximately March 31, 2008. Because the assignment of the Mortgage and Note purportedly did not take place until October 30, 2009, even the deadline for substitutions was missed by more than one year.

51. In addition to missing requisite deadlines, the chain of title violates the Trust Documents. Generally speaking, three sales of promissory notes and mortgages take place within the securitization process. These sales are all absolute sales made without recourse in order to effect bankruptcy remoteness for all entities involved. This "securitization chain of title" is commonly referred to as an A to B to C to D

transaction with notes and mortgages being sold from (A) the Originator to (B) the Seller or Sponsor to (C) the Depositor and to (D) the Issuer, more commonly referred to as the Trust itself. As such, any promissory note securitized and sold should have indorsements in the form of stamps directly on the Note itself or, if no room exists, on an appropriately attached allonge.

52. Pursuant to the PSA in this case, the Note and Mortgage were required to be transferred first from CTX to EMC Mortgage Corporation, then to Structured Asset Mortgage Investments II Inc., and finally to BONYM as Trustee.

53. However, the Note and Mortgage, at best, were transferred from MERS directly to the Trust. In other words, the assignment skipped all requisite intermediary assignments and transfers.

54. Neither MERS, nor any other entity, generally ever has any authority to sell, assign or transfer any asset or portion thereof directly into a Trust unless specified within the Trust documents. The Trust documents in this case do not provide MERS with the authority to so transfer. In other words, the Trust Documents do not provide MERS with the authority to bypass the "A-B-C-D" transfer chain.

55. The PSA is governed by New York trust law. Pursuant to said law, if the parties to the PSA do not act in accordance with the PSA, all resulting transfers and assignments are *void*. As such, because the transfers and/or assignments were not done in accordance with the PSA, they are *void*.

56. Upon information and belief, there are no provisions in the PSA which allow any of the Parties to ratify any non-compliant act. In fact, the PSA *requires* that its

provisions be complied with, and only provides alternative means by which the parties to the PSA may comply should they initially fail.

57. Furthermore, the PSA, at least, in part, serves to benefit the Plaintiffs because there are provisions therein allowing the Parties to the PSA to modify Plaintiffs' loan, and mandating that the Parties to the PSA protect the Plaintiffs' rights under the Mortgage contract, State, and Federal law.

<u>CLAIMS</u>

<u>Count I</u>
(Breach of Contract – Breach of Acceleration Clause -- Against BONYM)

58. Plaintiffs incorporate by reference, and re-allege, all previous Paragraphs of this Complaint.

59. The Plaintiffs' Mortgage requires that if the Borrower is in breach of the Mortgage Terms, the *Lender* must provide at least 30 days' notice prior to acceleration of the debt secured by the mortgage.

60. Chase sent the acceleration notice.

61. In fact, on February 22, 2013, BONYM claimed to hold the Mortgage and Note. Therefore, BONYM, not Chase, was required to provide the Plaintiffs with the acceleration notice. BONYM did not provide such a notice.

62. BONYM failed to provide the Plaintiffs with a Notice of Acceleration, which is a pre-requisite to a valid foreclosure sale. Because BONYM failed to provide such notice, it breached the terms of the contract, Plaintiffs have incurred damage to their reputation, Plaintiffs have incurred additional fees, interest, and arrears because the breach and confusion as to whom the Plaintiffs must pay made it impossible for them to pay, the Plaintiffs have incurred Attorney's fees and costs, and they are threatened with the loss

of their home by foreclosure.

## Count II
(No Power and Authority to Foreclose – Failure to Produce Original Note – Against BONYM)

63. Plaintiffs incorporate by reference, and re-allege, all previous Paragraphs of this Complaint.

64. In New Hampshire, the party seeking to foreclose holds the burden of showing that it has the authority to foreclose. It can only do so by showing that it holds the Note and Mortgage. In doing so, it must produce the original Note for inspection, and provide testimony as to when it was indorsed, especially where the foreclosing party is not the originator and when the Note is undated and indorsed in blank.

65. By the terms of the recorded instrument, MERS is the Mortgagee, and it is the nominee for CTX and its successors and assigns.

66. By assignment dated October 12, 2009, and filed October 30, 2009, BONYM allegedly became the holder of the Mortgage.

67. Indeed, when Harmon Law Offices produced the Note for inspection, both Chase and BONYM claimed the right to foreclose.

68. The Note contains an in blank indorsement which is undated.

69. It is not clear, as a result of the history of the chain of title, when BONYM became the holder of the Note, if at all, and whether it had or has the authority to foreclose.

70. Therefore, until BONYM can prove that it held the Note at the time of the foreclosure, it cannot show that it held the power and authority to foreclose. If it cannot show that it now holds the Note, it does not currently have the power and authority to foreclose.

### Count III
### (No Power and Authority to Foreclose Due to Missed Securitization Deadlines Rendering the Transfers Void)

71. Plaintiffs incorporate by reference, and re-allege all previous Paragraphs of this Complaint.

72. In order to be properly securitized into the Trust, the Note and Mortgage had to be transferred to the Trust by March 31, 2006, or at the latest, within two years thereafter. Instead, it was not until October 30, 2009 that the Mortgage was allegedly assigned to the Trust. It is unknown when, if ever, the Note was similarly transferred.

73. Therefore, because the Mortgage was not transferred to the Trust in time, it was not a valid transfer. Because New York Trust law voids transfers that do not comport with the Trust documents, the transfers and assignments in this case are void. Therefore, BONYM as Trustee does not hold the Mortgage, and therefore, lacks the power and authority to foreclose.

### Count IV
### (No Power and Authority to Foreclose Due to Lack of Unity of the Mortgage and the Note Rendering the Transfers Void)

74. Plaintiffs incorporate by reference, and re-allege, all previous Paragraphs of this Complaint.

75. In New Hampshire, the Mortgage and Note must be conveyed together. Therefore, when the Mortgage is separated from the Note, neither can be enforced. A person holding only a note lacks the power to foreclose because he lacks the security, and person holding only a mortgage suffers no default because only the holder of the note is entitled to payment on it. In this case, the Mortgage is unenforceable because it was separated from the Note on at least three occasions.

76. The first separation happened at origination when the Note and Mortgage were given to two different entities: The Mortgage to MERS and the Note to CTX.

77. The second separation happened when MERS (assuming it was acting as nominee for CTX) transferred the Mortgage, but did not similarly transfer the Note (nor is there evidence that any other entity transferred the Note when MERS assigned the Mortgage).

78. The third separation occurred when the Note and Mortgage were supposedly securitized. There is no evidence purporting to show that the Note and Mortgage were transferred into the Trust together.

79. Therefore, because BONYM cannot show that it holds both the Note and the Mortgage, and because it cannot show that the Note and Mortgage were transferred together throughout the life of the loan, it does not have the power and authority to foreclose.

### Count V
(No Power and Authority Because the Transfers/Assignments to BONYM Failed to Follow the Requisite Chain, Thereby Rendering Said Transfers Void)

80. Plaintiffs incorporate by reference, and re-allege, all previous Paragraphs of this Complaint.

81. Pursuant to the PSA, in order to be properly securitized into the Trust, the Note and Mortgage must have been transferred in the following manner: First from CTX to EMC Mortgage Corporation, then to Structured Asset Mortgage Investments II Inc., and finally to BONYM, as Trustee.

82. However, in this case, the Mortgage was transferred from MERS directly to BONYM as Trustee. In other words, the transfer did not follow the requisite chain. Furthermore, there is no evidence as to whether the Note followed a similar chain of transfer.

83. The PSA is governed by New York trust law. Pursuant to New York trust law, transfers

that do not comply with those required by the PSA are *void*.

84. Thus, the transfer from CTX to BONYM as Trustee is void, and BONYM cannot have the power and authority under the Mortgage to foreclose. Similarly, the Note was not transferred pursuant to the terms of the PSA. Therefore, the transfers are also void.

85. Because, pursuant to New York Trust Law, the transfers are void, BONYM cannot hold the Mortgage or Note, and therefore cannot foreclose.

Count VI
(Breach of the Covenant of Good Faith and Fair Dealing – Against Both Defendants)

86. Plaintiffs incorporate by reference, and re-allege, all previous Paragraphs of this Complaint.

87. Inherent to every contract is the covenant of good faith and fair dealing. Where a contract parties intended to make, confers upon one party a degree of discretion in performance tantamount to a power to deprive the plaintiff of a substantial proportion of the agreement's value, and the party with discretion exceeds the limits of reasonableness and the plaintiff is damaged thereby, the defendant has breached the covenant of good faith and fair dealing.

88. In the mortgage context, where the mortgagee has the discretion to foreclose or offer alternatives thereto, its refusal to consider loss mitigation options constitutes a violation of the covenant of good faith and fair dealing.

89. The Mortgage provides the Defendants with discretion to foreclose, and provides that loss mitigation opportunities may be pursued instead. However, the Defendants never considered the Plaintiffs for any loss mitigation opportunities. Indeed, the Plaintiffs attempted a short-sale and had a buyer ready, willing, and able to purchase the home, but the Defendants never followed through and accepted or rejected the offer. Furthermore,

the Plaintiffs submitted loan modification applications, which the Defendants never fully considered.

90. As a result of the Defendants' breach of the covenant of good faith and fair dealing, the Plaintiffs have suffered accruing arrears, accruing interest, accrued fees, damage to their reputation, and they are facing the foreclosure of their home.

PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court grant the following relief:

*Injunctive Relief*

(A) Temporarily, Preliminarily, and Permanently enjoin BONYM from conducting a foreclosure sale; and

*Declaratory Relief*

(B) Declare that BONYM is not the legal holder of Plaintiffs' First Mortgage and Note; and

(C) Declare that BONYM does not have the Power and Authority to foreclose; and

*Damages*

(D) Award the Plaintiffs their compensatory damages for BONYM's Breach of Contract;

(E) Award the Plaintiffs their compensatory damages for BONYM's and SPS' breach of the covenant of good faith and fair dealing; and

(F) Award the Plaintiffs their Attorney's Fees and Costs pursuant to RSA § 361-C;

(G) Award the Plaintiffs their Attorney's Fees and Costs pursuant to the Mortgage Contract; and

(H) Grant all further relief that this Honorable Court deems just and proper.

## Jury Demand

**Plaintiffs hereby demand a trial by jury.**

Dated: July 28, 2015

Respectfully submitted,
Mark L. Dove and Kathleen M. Stavaski,
By, The Law Offices of Martin & Hipple, PLLC

_/s/Stephen T. Martin_____
Stephen T. Martin, Esq.
22 Bridge Street; Suite 3
Concord, NH 03301
603-856-0202 (Ext. 1)
smartin@nhlegalservice.com
NH Bar#: 19567

## CERTIFICATE OF SERVICE

COMES NOW Attorney Stephen T. Martin, Counsel for the Plaintiffs, and hereby certifies that I have caused a copy of the foregoing to be served to all Counsel of record, using this Court's CM/ECF system.

Dated: July 28, 2015

_/s/Stephen T. Martin_____
Stephen T. Martin, Esq.